STANDARD OIL COMPANY, an Indiana Corporation, Appellant,

v.

Edward H. KURTZ, Trustee of Meadow Rock Company, Bankrupt, Appellee.

No. 17299.

United States Court of Appeals Eighth Circuit.

April 15, 1964.

Joseph J. Barmettler, Omaha, Neb., for appellant, James W. R. Brown and Lyle E. Strom, of Fitzgerald, Hamer, Brown & Leahy, Omaha, Neb., on the brief.

Robert H. Berkshire, of Swarr, May, Royce, Smith, Andersen & Ross, Omaha, Neb., for appellee.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and DAVIES, District Judge.

BLACKMUN, Circuit Judge.

Standard Oil Company appeals from the district court's order affirming the Referee's denial of Standard's claim for priority under § 64, sub. a(4) of the Bankruptcy Act, 11 U.S.C.A. § 104, sub. a(4).[1] The controversy concerns the Nebraska tax imposed by R.R.S. Neb.1943, ch. 66, art. 4, with respect to "motor vehicle fuels". The facts are stipulated.

On an involuntary petition, Meadow Rock Company, Springfield, Nebraska, was adjudged bankrupt on October 3, 1960. Standard filed its claim in the amount of $49,519.11 for gasoline and other petroleum products sold to the bankrupt on open account and not paid for at the time of the bankruptcy. Later

Standard moved that two components of this claim be classified as entitled to the fourth priority. One component, comprising $5,860.84, was the amount of the Nebraska "Motor Fuel Excise Taxes". The other component was the amount of the federal gasoline and lubricating oil excise taxes imposed under §§ 4081 and 4091, as amended, of the Internal Revenue Code of 1954. The Referee refused these priorities but he allowed the claim in its entirety as a general claim. Standard appeals only with respect to the Nebraska tax and no longer asserts priority for the federal taxes.

By written contract Standard agreed to sell and deliver gasoline to the bankrupt at the latter's plant in Nebraska. Meadow Rock agreed to pay, in addition to the stated price, "any tax, excise * * * or other like charge levied, assessed or imposed upon the products sold hereunder, or on the manufacture, storage, sale, transportation, delivery, use and/or consumption thereof". Pursuant to this contract, Standard sold the bankrupt the gasoline now covered by its claim. This gasoline was delivered between October 1959 and July 1960 in transport trucks operating from Standard's terminal in Iowa, near Council Bluffs, direct to the bankrupt's facilities in Nebraska. The fuel was for Meadow Rock's own use and was not for resale; it was in fact consumed by the bankrupt.

Standard prepared an invoice for each delivery. The invoice, as did those covering earlier deliveries for which Meadow Rock had made payment, stated the price of the commodity sold, exclusive of all taxes, and then separately itemized the Nebraska tax and the federal tax. Standard made fuel tax reports monthly to the Nebraska Motor Fuels Division of the Department of Agriculture and Inspection. It set forth therein, with clear and appropriate designation of its vendees, the deliveries it had made during

---

1. § 104. "(a) The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be * * * (4) taxes legally due and owing by the bankrupt to the United States or any State * * *."

the month including those to the bankrupt. These reports carried a computation, after a deduction (hereinafter referred to) of 3% for shrinkage, of the 7¢ per gallon Nebraska tax. The tax, less a collection charge (also hereinafter referred to), was remitted by Standard to the State with the report. These Nebraska payments made by Standard were substantial (aggregating $3,342,-556.18 for the ten months from October 1959 to July 1960, both inclusive), and included the $5,860.84 now in controversy. The bankrupt filed no report and made no payment direct to Nebraska.

The Referee in his conclusions observed that the fourth priority clause "is to protect the sovereign"; that, however, such protection was not involved here because Nebraska had been paid and was not "interested in any degree or in any manner in these particular funds"; that it is not sufficient under the Act that taxes are involved; that they must be taxes "legally due and owing"; that this means taxes due and owing on the date the bankruptcy proceeding was instituted; that there were no taxes then due and owing because they had been paid; that all that remained was Standard's right to collect an equivalent amount of money from the bankrupt; that the bankrupt owed Standard no taxes but only reimbursement; and that subrogation cannot clothe Standard with the cloak of sovereignty.

The district court in affirming stated merely that it was "satisfied from the record that the Referee's findings of fact are supported by the evidence and that he reached a proper conclusion".

Standard's argument here is that the Nebraska tax is one imposed upon the consumer; that the latter is primarily liable for it; that when Standard, as dealer, paid the tax it became subrogated to the State's priority in the bankruptcy proceedings; and that the bankrupt's obligation did not cease when Standard paid the tax. The trustee, on the other hand, asserts that the tax is not on the bankrupt; that Standard is thus not entitled to priority; and that the claim is not one for "taxes legally due and owing * * * to * * * any State".

■■ For purposes of this case, we may accept the trustee's argument that the fourth priority clause of § 64, sub. a, is to be strictly construed and that the burden of establishing a priority is on the claimant. See Goldie v. Cox, 130 F.2d 690, 693 (8 Cir. 1942) ; In re North Atlantic & Gulf S. S. Co., 192 F.Supp. 107, 108 (S.D.N.Y.1961) ; In re American Anthracite & Bituminous Coal Corp., 171 F.Supp. 377, 382 (S.D.N.Y.1959), aff'd 280 F.2d 119 (2 Cir.) ; In re Witt Dairy Co., 48 F.Supp. 964, 968 (N.D.Cal. 1942) ; 3 Collier on Bankruptcy (14th ed.), Par. 64.02 [6]. Compare In re Oshkosh Foundry Co., 28 F.Supp. 412, 413 (E.D.Wis.1939) ; In re Raflowitz, 37 F.Supp. 202, 204 (D.Conn.1941). "The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate", Kothe v. R. C. Taylor Trust, 280 U.S. 224, 227, 50 S.Ct. 142, 143, 74 L.Ed. 382 (1930), and "if one claimant is to be preferred over others, the purpose should be clear from the statute". Nathanson v. NLRB, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952) ; United States v. Embassy Restaurant, Inc., 359 U.S. 29, 31, 79 S.Ct. 554, 3 L.Ed.2d 601 (1951).[2]

■■ Furthermore, whether a given obligation is a tax within the meaning of the fourth priority clause is a federal question and is not to be controlled "by the particular characterization by local law or the state's demand". New York v. Feiring, 313 U.S. 283, 285, 61 S.Ct.

---

2. Compare, however, the situation as to the fifth priority for "debts owing to any person, including the United States" entitled to priority by federal law. It has been said, with respect to this, that the "tendency has been to interpret these provisions liberally to secure the advantage sought by the Congress". United States v. Marxen, 307 U.S. 200, 206, 59 S.Ct. 811, 814, 83 L.Ed. 1222 (1939). See Massachusetts v. United States, 333 U.S. 611, 627, footnote 26, 68 S.Ct. 747, 92 L.Ed. 968 (1948), and In re Wm. Akers, Jr., Co., 121 F.2d 846, 848 (3 Cir. 1941).

1028, 1029, 85 L.Ed. 1333 (1941); New Jersey v. Anderson, 203 U.S. 483, 492, 27 S.Ct. 127, 51 L.Ed. 284 (1906); City of New York v. Rassner, 127 F.2d 703, 706 (2 Cir. 1942); 3 Collier on Bankruptcy (14th ed.), Par. 64.404, p. 2155. Nevertheless, one is to turn to the state statute, and to state court decisions interpreting it, "not to learn whether they have denominated the obligation a 'tax' but to ascertain whether its incidents are such as to constitute a tax within the meaning of § 64", that is, whether it is a pecuniary burden "laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it". New York v. Feiring, supra, p. 285 of 313 U.S., p. 1029 of 61 S.Ct., 85 L.Ed. 1333; New Jersey v. Anderson, supra, p. 492 of 203 U.S., p. 140 of 27 S.Ct.; United States v. New York, 315 U.S. 510, 515–516, 62 S.Ct. 712, 86 L.Ed. 998 (1942).

With these general principles in mind, we examine the Nebraska statutes. This material, as has been noted, is contained in Article 4, Chapter 66, R.R.S.Neb.1943, and consists of some 60 sections.

A "dealer" is defined by § 66–401(3) to include, among others, any corporation which imports motor vehicle fuel into Nebraska for use in that state. The dealer shall procure a license and deposit cash or furnish a bond conditioned for the payment of all taxes and penalties which may be assessed against it under the first 25 sections. § 66–403. It must keep a complete and accurate record and by the 15th[3] of each calendar month it shall file a gallonage statement on prescribed forms. §§ 66–408 and 66–409. When the statement is filed the "dealer shall * * * pay a tax of seven cents per gallon upon all motor vehicle fuels as shown by such statement". § 66–410. But the dealer who has so paid "said tax * * * or being liable for its payment, shall collect the amount thereof from any person, firm or corporation to whom said motor vehicle fuel is sold in this state, along with the selling price thereof". § 66–411. A dealer's failure to pay the tax when due results in the imposition of interest and a civil suit for collection, § 66–416, and such failure to pay or to file the required statement may result in license suspension or revocation and an automatic penalty per gallon. §§ 66–417 and 66–418. Under certain circumstances the failure may constitute a misdemeanor. § 66–419.

The dealer is allowed 3% shrinkage. § 66–414. Also, "in lieu of" its collection, remittance and bond expense the dealer "shall be entitled to a commission" of a designated percentage "upon the amount remitted each month". § 66–407. These shrinkage and collection allowances are asserted in the prescribed monthly statement form. There are provisions for refund of tax paid on fuel destroyed by fire or act of God, or consumed by the United States government or its agencies, or sold in a state other than Nebraska, § 66–413, and against double taxation, § 66–415.

These statutes, §§ 66–401 to 66–425, inclusive, thus far described appear to have their origin primarily in Laws 1925, ch. 172, and Laws 1927, ch. 151. They have, of course, been amended and added to from time to time.

Sections 66–428 to 66–431, inclusive, on the other hand, have their origin in Laws 1931, ch. 130. Section 66–428 imposes "upon the use"[4] of all motor vehicle fuels a 7¢ per gallon excise tax "due the State of Nebraska under the provisions of section 66–410". Section 66–429 requires the user to pay the tax and make the report but also provides that if a dealer has paid "said tax, or being liable for its payment, shall collect the amount thereof" from the vendee. The same section, however, specifically states that no tax and no report shall

---

3. Changed to the 20th by L.1963, ch. 376, § 2.

4. L.1963, ch. 379, § 1, added at the end of § 66–428 the sentence, "For purposes of this section and section 66–429, use shall mean the purchase or consumption of motor vehicle fuels in this state".

be required if "such tax shall have been paid and report made for said user by any [licensed] dealer". Sections 66–430 and 66–431 make the 20th of each month the due date and provide for penalty and interest, for criminal punishment, and (as §§ 66–416 to 66–419 did not) for attorneys' collection costs.

Sections 66–445 to 66–466, inclusive, concern "refund tax gasoline", and prescribe the method of obtaining refund of a portion of the tax paid with respect to gasoline or fuel used, as § 66–452 states, for specified purposes "or for some purpose not involving the use of any highways in this state". Section 66–452 further provides, "No refund shall be made to anyone other than the actual purchaser of such refund tax gasoline or motor vehicle fuel".

The trustee argues that the tax imposed by the first 25 sections and, in particular, by § 66–410, is separate and distinct from that imposed by §§ 66–428 to 66–431, inclusive, and, in particular, by § 66–428. He points out that in the first 25 sections there is nothing which requires the purchaser to pay the tax; that, instead, the dealer pays it; that the tax attaches to all fuel stored in or shipped into Nebraska, regardless of whether it has been sold; that the statute does not describe the collection from the consumer as a tax; that it does not authorize the state to proceed against the vendee if it fails to pay the dealer; that there is no statement that the tax is on the purchaser; that all the penalties are directed to the dealer; and that the collection provisions of § 66–411 merely express the legislative intent that the effect of the tax, but not its impact is to be shifted to the consumer.

Standard argues that Article 4 in its entirety imposes one tax at 7¢ a gallon; that § 66–428 ties in directly to § 66–410; that the tax under the former section is the same tax under the latter section; that, although originally there was no direct levy upon the user, one was imposed in 1955; and that the amendment of that year brought the Nebraska law "into complete harmony".

The initial issue as to the place of impact of the Nebraska tax is perhaps not free from difficulty. Of some significance is the early case of Burke v. Bass, 123 Neb. 297, 242 N.W. 606 (1932). This was an action by a purchaser to enjoin collection of the tax. The Supreme Court of Nebraska, in commenting upon the statute which is the predecessor of the first 25 sections of Article 4, said, p. 607, of 242 N.W.,

"The tax is an excise tax upon the use and distribution of gasoline within the state. * * * It is not an impost tax. It applies to all motor vehicle fuels used and distributed within the state. For convenience, it is collected as nearly as possible to the source of production, from him who has it in his possession for use, distribution, sale or delivery in the state. * * *

"The construction of such a statute must be judged by its necessary effect. * * * The effect of this statute is to tax the use and sale within the state."

From this language it is evident that (a) the tax is an excise upon the use of gasoline, and (b) it is collected "for convenience" from the dealer. The Nebraska court adhered to this excise characterization in subsequent opinions. State v. Cheyenne County, 127 Neb. 619, 256 N.W. 67, 69 (1934); State v. Smith, 135 Neb. 423, 281 N.W. 851, 855 (1938). It is true that Burke v. Bass had to do primarily with the alleged interstate commerce aspect and, consequently, the question of federal constitutionality. But we do not gather from the opinion that the Nebraska court determined the tax to be one, as the trustee urges, solely upon the dealer. In fact it recognized the dealer only as a convenient collector. In Smithberger v. Banning, 130 Neb. 354, 265 N.W. 10, 12 (1936), the court even referred to the "ultimate consumer who was the actual source of the payment" of the tax and there held that the consumer would be a necessary party in a refund action.

■ After a careful study of Article 4 in its entirety, we conclude that, whether the first 25 sections did or did not at one time impose a tax separate and distinct from that under §§ 66–428 to 66–431, the tax (or taxes) imposed by Article 4, as it read in 1959 and 1960 when the remittances here were made by Standard and when Meadow Rock's adjudication in bankruptcy was effected, was a unitary tax; that it is a tax, within the meaning of the Bankruptcy Act's § 64, sub. a(4); that its realistic impact is upon the consumer and not upon the dealer; and that the dealer's interposition amounts to no more than a practical collection convenience for the state. We reach this conclusion for the following reasons:

1. Despite some differences as to penalties, interest and other items which are essentially details, the tax under what is now § 66–428 obviously was originally intended to be complementary to that under what is now § 66–410 and was designed to apply to that fuel use in Nebraska which otherwise, as a practical matter, would be beyond the reach of § 66–410. An example of this could be gasoline purchased outside the state from a dealer which had no contact with Nebraska and which the state could not reach for the imposition of collection tasks.

2. This complementary tax, even before the 1955 amendment, was clearly akin to § 66–410 and the first 25 sections of Article 4. Its rates were the same and its exemptions were the same.

3. By the 1955 amendment the tax imposed by § 66–428 is declared to be that "due the State of Nebraska under the provisions of section 66–410" and the exemptions, and the like, again are the same as those of §§ 66–413 and 66–414. Further, the definition of "use" is that of § 66–401 (plus, now, the additional definition supplied in 1963; see footnote 4, supra). This leads almost inevitably to the result that the tax under § 66–428 is the very one under § 66–410 and that the two taxes, if they were two, are now one and the same.

4. The tax under § 66–428 attaches to the use of the fuel. The user, by § 66–429, is the one who is to pay it unless, with his knowledge and consent, or at his request, the tax shall have been paid by a licensed dealer. The interconnection of the sections must therefore indicate that § 66–410 also applies to use and rests its ultimate impact there and not upon the dealer.

5. The commission allowance, under § 66–407, characterizes the dealer as a collection agent, as was intimated in Burke v. Bass, supra. The commission is the dealer's compensation for the collection services he renders.[5] But no comparable allowance is made for any tax paid direct by the user under § 66–429. This commission-for-the-dealer feature would make no sense for a tax which is on the dealer, for there would be no point in allowing a taxpayer a commission for paying his own tax.

6. It is true that § 66–407 makes reference to the dealer's remitting the "gasoline tax" and that § 66–410 provides that the dealer "shall * * * pay a tax" and "shall remit such tax." Section 66–410, however, also refers to the tax as one "upon all motor vehicle fuels" and it does not describe it as one upon the dealer. We attach no special significance to these referrals to a tax. We are not persuaded, either, that any significance lies in the fact that § 66–411 refers to "the amount thereof", rather than to "the tax".[6]

7. The non-highway use refund provision of § 66–452, with its reference to

5. Making a distributor a tax collector for the state is "a familiar and sanctioned device". General Trading Co. v. State Tax Commission, 322 U.S. 335, 338, 64 S.Ct. 1028, 88 L.Ed. 1309 (1944); Monamotor Oil Co. v. Johnson, 292 U.S. 86, 93, 54 S.Ct. 575, 78 L.Ed. 1141 (1934);

Felt & Tarrant Mfg. Co. v. Gallagher, 306 U.S. 62, 68, 59 S.Ct. 376, 83 L.Ed. 488 (1939).

6. Compare Iowa Code Annot., § 324.3 (in its pre-1957 form), and Monamotor v. Johnson, supra, 292 U.S. 86, 54 S.Ct. 575, 78 L.Ed. 1141.

184

the amount paid under § 66–410 and with its application restricted to "the actual purchaser", convincingly spotlights the ultimate impact of the tax itself.

Because of differences in phraseology and varying historical background, cases involving the statutes of other states are not too helpful. Nevertheless we find support for our conclusion in the following: Monamotor Oil Co. v. Johnson, 292 U.S. 86, 93, 95, 54 S.Ct. 575, 579, 78 L.Ed. 1141 (1934) (concerning the Iowa statute which had striking similarity to that of Nebraska, with the court concluding that the tax was an excise upon the use of fuel for motor vehicles on the highways of the state and "that the statutes properly construed lay no tax whatever upon distributors, but make of them mere collectors from users of motor vehicle fuel"); Texas Co. v. Miller, 165 F.2d 111, 114 (5 Cir. 1947), cert. denied 333 U.S. 880, 68 S.Ct. 911, 92 L.Ed. 1155 (the Texas statute, with the court, in reaching its conclusion that the tax was the consumer's, relying among other features upon the collection allowance to the distributor, the restriction of any refund to the claimant who actually paid the tax, the dealer's obligation to collect from the vendee, and the requirement that the tax be added to the selling price); Commonwealth v. Wallace, 294 Mass. 31, 200 N.E. 406 (1936) (the Massachusetts statute).

On the other hand, there are cases elsewhere concerning similar statutes where the opposite result has been reached. In re Newland, 115 F.2d 165 (3 Cir. 1940) (the Pennsylvania statute); In re Conklin, 110 F.2d 178 (2 Cir. 1940) (the New York statute); In re Page Express, Inc., 220 F.Supp. 14 (D.Conn.1963) (the Connecticut statute). In these cases, however, the tax's impact was determined to be on the distributor rather than on the consumer. This, we think, is significant and pivotal.

■ This conclusion, of course, does not perfect Standard's case. It merely identifies and qualifies the Nebraska levy as the bankrupt's tax. Still to be resolved are the questions whether this was a tax "legally due and owing by the bankrupt" to the State of Nebraska, and, if so, whether Standard, by having paid the tax, is subrogated to the fourth priority.

We conclude that each of these questions is to be answered in the affirmative. Over a half century ago the Supreme Court settled the matter so far as wages and their priority were concerned. In Shropshire, Woodliff & Co. v. Bush, 204 U.S. 186, 189, 27 S.Ct. 178, 51 L.Ed. 436 (1907), an assignee of wage claims was granted priority. The Court said, p. 189 of 204 U.S. p. 179 of 27 S.Ct.:

"The priority is attached to the debt, and not to the person of the creditor; to the claim, and not to the claimant. The act does not enumerate classes of creditors and confer upon them the privilege of priority in payment, but, on the other hand, enumerates classes of debts as 'the debts to have priority.' * * * The character of the debts was fixed when they were incurred, and could not be changed by an assignment."

To the same effect are Bass v. Shutan, 259 F.2d 561, 563 (9 Cir. 1958); In re Otto, 146 F.Supp. 786, 791 (S.D.Cal. 1956); 3 Collier on Bankruptcy (14th ed.), Par. 64.205. See Home Indem. Co. v. F. H. Donovan Painting Co., 325 F.2d 870, 874 (8 Cir. 1963). The Supreme Court has noted, in United States v. Embassy Restaurant, Inc., supra, 359 U.S. 29, 34, 79 S.Ct. 554, 557, 3 L.Ed. 2d 601, that "assignability of wage claims as in Shropshire, may benefit the bankrupt's employees, who are thus enabled to obtain their money sooner than they might by waiting out the bankruptcy procedure". We do not read Embassy, as the trustee would have us do, as in any way restricting or changing this principle of protection for the wage earner. Shropshire was carefully distinguished in Embassy. See and compare Sulmeyer v. Southern Calif. Pipe Trades Trust Fund, 301 F.2d 768 (9 Cir. 1962).

Expectedly, much the same has been forthcoming with respect to the priority for certain taxes. Involuntary payment of these by a third party has been said not to extinguish the obligation. Instead, it is "treated as still subsisting" for the payer's benefit. Texas Co. v. Miller, supra, 165 F.2d 111, 115–116; In re Baltimore Pearl Hominy Co., 5 F.2d 553, 555 (4 Cir. 1925); Gilbert v. United States Fid. & Guar. Co., 180 F. Supp. 794, 796 (M.D.Ga.1959), aff'd 274 F.2d 823 (5 Cir. 1960).

With the tax obligation thus still subsisting, it follows easily that Standard, having been the payer of the tax and having been required by the Nebraska statute to effect that payment, is entitled to subrogation to the state's priority under § 64, sub. a(4). Texas Co. v. Miller, supra, pp. 114–116 of 165 F.2d (gasoline tax); In re Baltimore Pearl Hominy Co., supra, pp. 555–556 of 5 F.2d (federal income tax); In re Columbian Tobacco Co., 121 F.2d 641, 643 (2 Cir. 1941) (cigarette tax); 3 Collier on Bankruptcy (14th ed.) Par. 64.408 [1], p. 2215. See Dayton v. Stanard, 241 U.S. 588, 36 S.Ct. 695, 60 L.Ed. 1190 (1916)) property tax); In re Ingersoll Co., 148 F.2d 282, 285 (10 Cir. 1945) (property tax); Texas Co. v. Blue Way Lines, 93 F.2d 593, 594 (1 Cir. 1937) (gasoline tax); Gilbert v. United States Fid. & Guar. Co., supra (gasoline tax); Restatement of the Law of Restitution, § 162, comment f; John v. Connell, 61 Neb. 267, 85 N.W. 82, 83 (1901); State v. Several Parcels of Land, 90 Neb. 549, 134 N.W. 161, 162 (1912).

The policy which protects the worker in the wage situation applies with somewhat equal force to protect at least the non-volunteer who is required to pay the tax of the bankrupt and who has thus placed the tax authorities in funds earlier and more easily than would otherwise be the case. Here, too, the priority attaches to the claim and not to the identity of the particular claimant who now asserts it. We regard the foregoing authorities as meaningful and persuasive here. We need not pass upon the case, and do not, where the payer of the tax is a volunteer and under no statutory requirement to make that payment.

The situation is different, of course, where the tax rests upon the distributor alone, or where the distributor is primarily liable, even though the statute may contemplate that its burden may be passed on. McCarroll v. Jean, 119 F.2d 71, 73 (8 Cir. 1941) (cigarette tax); In re Newland, supra, 115 F.2d 165; In re Conklin, supra, 110 F.2d 178; 3 Collier on Bankruptcy (14th ed.) Par. 64.408 [4], Par. 64.405, footnote 57. Compare R. J. Saunders & Co. v. Vincent, 309 F.2d 65 (2 Cir. 1962).

Reversed and remanded for further proceedings in conformity with this opinion.